# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF MASSACHUSETTS

## EASTERN DIVISION

| | |
|---|---|
| In re<br><br>JOHN RIBEIRO, JR.,<br><br>               Debtor | Chapter 7<br>Case No. 11-11177-FJB |
| LAURENCE MEADS,<br><br>             Plaintiff<br><br>v.<br><br>JOHN RIBEIRO, JR.,<br><br>            Defendant | Adversary Proceeding<br>No. 11-1188 |

### AMENDED MEMORANDUM OF DECISION[1]

Plaintiff Laurence Meads ("Meads") seeks a determination that his claim against the defendant and chapter 7 debtor, John Ribeiro, Jr. ("Ribeiro"), a claim arising from a lease of commercial property and related promissory note, is excepted from discharge under 11 U.S.C. § 523(a)(2)(A) as a debt arising from false representations, false pretenses, and actual fraud. After a trial, the court now makes the following findings and rulings and, on the basis thereof, concludes that the obligation is not excepted from discharge.

**PROCEDURAL HISTORY**

On February 15, 2011, Ribeiro filed a petition for relief under Chapter 13 of the Bankruptcy Code, commencing the present bankruptcy case. On March 3, 2011, he converted the case to one under Chapter 7 and, in due course, received a discharge under that chapter. In the chapter 7 portion of the

---

[1] The Court hereby amends its original memorandum of decision [doc. #64] only to correct certain typographical errors on pages 7, 11-13, and 20.

case, Meads timely filed the complaint commencing this adversary proceeding.  The complaint seeks a determination that Meads' pre-petition claim against Ribeiro, for the balance due on a promissory note as amended, is excepted from discharge under 11 U.S.C. § 523(a)(2)(A) as a debt arising from false representations and false pretenses.  In the complaint, Meads also asserts a second count, for a determination that, on the basis of the same false representations and false pretenses, the debt is one for unfair and deceptive trade practices, for which Ribeiro should be subject to trebled damages and costs and fees under Mass. Gen. Laws ch. 93A.  Ribeiro, opposing both counts, denies the allegations of false representations and false pretenses and asserts a counterclaim, also under ch. 93A.

In his count under § 523(a)(2)(A), Meads alleges generally that "[d]efendant's conduct and representations to plaintiff constituted false pretenses, false representations or actual fraud," but Meads does not specify in the complaint which of the earlier described conduct and representations constituted the false pretenses, false representations, or actual fraud in question.  With respect to the loan of September 26, 2007, the complaint mentions no conduct at all, other than that Ribeiro executed the attendant promissory note, and the complaint mentions only one representation:  "At the time of execution of this promissory note defendant again assured plaintiff that he (defendant) expected to have one or more investors involved with the restaurant in the near future."  The complaint does not allege that this representation was false.  With respect to the amendment to the loan on July 26, 2009, the complaint again mentions no conduct at all, other than that Ribeiro executed the amended promissory note, and it mentions only the following five representations:  "Defendant again assured plaintiff" (i) "that the restaurant was a viable business,"  (ii) "that his taxes and other business expenses were being paid," (iii) "that he would faithfully make monthly payments on the note," (iv) "that he would obtain a mortgage on his residence if necessary to pay the note," and (v) "that he was searching for investors for the restaurant."  The complaint does not allege that any of these representations was false.

The parties filed a joint pretrial memorandum in which Meads was obligated to and did supply a statement summarizing his case.  In this statement, Meads reiterated verbatim the above allegations from his complaint and added only the following (the "Supplemental Paragraph"):

> Defendant repeatedly promised plaintiff that he would come current in his rental obligations and that he was concentrating on running the business, when he was actually spending money on other things and neglecting the business, including failing to pay municipal taxes. Plaintiff, who is defendant's cousin, actually and justifiably relied on defendant's promises that he would comply with the terms of the lease, come current in his rent and pay his obligations under the promissory note.

At no time did Meads move to amend the complaint to indicate that he is proceeding on the basis of the new alleged representations in this Supplemental Paragraph.

In proposed findings and conclusions he filed after trial, Meads seeks findings and rulings concerning yet another alleged misrepresentation:  that, in order to induce Meads to make both the original loan and the amendment to the loan, Ribeiro promised Meads that he would name him as the beneficiary on a $50,000 term life insurance policy, but Ribeiro did not intend to honor that promise when he made it.  Meads has never moved to amend the complaint to add this alleged misrepresentation as a basis of his count under § 523(a)(2)(A).

At the close of the trial, Meads' counsel indicated that he would move to amend the complaint to make clear that Meads is a plaintiff not only in his individual capacity but also in his capacity as trustee of the MLM Realty Trust, on the theory that the debt in question is owed to the Trust.  However, Meads never moved to so amend the complaint.  In any event, the debt in question arises under a promissory note and an amendment thereto, and the payee on the promissory note, both before and after amendment, is Meads in his individual capacity.

A one-day trial was held and closing arguments were made on a later date, at which time I took the matter under advisement.

3

**FINDINGS OF FACT**

    a.    **Leasing and Opening the Diner**

Ribeiro and Meads are third or fourth cousins with a close familial relationship.  Growing up, Ribeiro babysat Meads, who looked up to Ribeiro as an older brother.  Meads has owned and operated a filling and service station in Revere since 1987.  Across the street from the service station sits a diner.  In 2002, Meads, as trustee of the MLM Realty Trust (the "Trust"), purchased the diner and the land on which it sits.  He did this by giving the previous owner a down payment and a mortgage for the balance.  Meads had a beneficial interest in the Trust, but only for the duration of his life, with the remainder interest belonging to another beneficiary.  When Meads purchased the diner, it had been shut down for some time, so what Meads purchased was not a functioning business.

Ribeiro worked for twenty-one years as a probation officer for the City of Boston and, around the time Meads purchased the diner, had recently retired from that position.  Ribeiro was also a cook, mostly as a hobby, and, much earlier in his life, had had a little experience operating restaurants and a catering business.  Around the time Ribeiro retired from his career as a probation officer in 2003, Meads approached Ribeiro with an offer for the latter to lease the diner from him to operate a restaurant on the premises.

When these discussions took place, the diner was in need of renovation before it could be opened.  Meads told Ribeiro that only minor cosmetic work was necessary and described the diner as a "turnkey" operation.  Neither proved to be true.  Ribeiro admitted that he had time to investigate the property and the extent of the necessary renovations, but largely he just trusted Meads' representations.  Meads contends that Ribeiro is an educated man, and so he is, but it is also clear that Ribeiro is not savvy in the ways of business.

Meads gave Ribeiro two options regarding the renovations.  The first was for Ribeiro to do the renovations himself in exchange for forgiveness of the first year's rent.  The other was for Meads to assume responsibility for the renovations but with no forgiveness of rent.  Ribeiro chose the first option.

On May 6, 2003, the Trust, as lessor, and the Jonquille Suffolk Diner ("Jonquille"), as lessee, entered into a lease of the diner and the real property on which it sits.  Meads executed the lease for the Trust, Ribeiro for Jonquille.[2]  The lease was for a one-year term, from November 1, 2002, through October 31, 2003, renewable for three three-year terms.  The initial year's rent, forgiven by agreement, was $2,000 per month; monthly rent would increase to $2,300 in the first three-year extension, $2,600 in the second, and $2,900 in the third.  Jonquille was also responsible for payment of real estate taxes, utilities, insurance, and all costs of maintenance and repair on the premises.

### b.    Running the Diner

The renovation took approximately a year to complete.  Ribeiro had to "gut out" the diner and remodel and landscape.  He also had trouble with the septic system; sewage would back up and sometimes flow onto the property.  Ribeiro also had trouble obtaining licensing for the restaurant; contrary to his expectations, the diner was not "grandfathered in," which required that he obtain new permits.  Ribeiro invested a considerable portion of his resources—including a $150,000 inheritance and proceeds from a loan secured by a mortgage on the remaining equity in his house—into the renovation and licensing effort.

He opened the diner for business sometime in 2003 and continued to operate it until he vacated the premises in 2010, in settlement of an eviction proceeding commenced by Meads for nonpayment of rent.  During this period, the diner never made a profit.  His efforts in this regard ran into serious

---

[2] There is no testimony as to the precise relation of Ribeiro to Jonquille.  Later documents identify Ribeiro variously as "proprietor" and "president" of Jonquille and a guarantor of Jonquille's debt to Meads.  Sole proprietorships seldom have a president, and they have no need for the proprietor to act as guarantor (of what amounts to his own debt).  On the other hand, there is no other evidence that Jonquille is an incorporated entity.

obstacles.  He had continuing problems with the septic system in the early years.  In 2007, the road on

which the diner was located was torn up and closed to through-traffic for a considerable time, which

severely reduced business.  Also in 2007, Ribeiro was in an automobile accident that necessitated

rotator cuff surgery; this limited his ability to use his right arm for about a year.  In 2008, he experienced

a bout of vertigo that limited his ability to drive.  And most significantly, in 2009 he suffered a stroke

that affected his speech, equilibrium, and use of his arm, all for about a year.  These medical problems

compromised his ability to run and work at the diner, and they increased the costs of operation by

requiring that he hire others to do work he would otherwise have done himself.  To the extent that he

could work, however, Ribeiro worked long and hard at the diner over the seven years of its business life,

and he invested virtually all his financial resources into making it successful and paying its bills.  The toll

on him in money, time, and energy was high. He testified credibly that his commitment to the diner

eventually destroyed his marriage, as he and his wife divorced in 2010 or 2011.  Also, having mortgaged

his house to finance the business, he was unable to service the resulting debt and, in the end, lost the

house to foreclosure.  There is no evidence that the diner had any earnings that Ribeiro did not use for

operation of the business and payment of its obligations.  Nor is there evidence that Ribeiro had income

or other resources, apart from those of the business, that he did not use either for his family's

necessities or to pay for needs and obligations of the business.

### c.    The Original Promissory Note

In the first few years of the lease, Jonquille missed many rent payments, such that by 2007,

there was a significant arrearage.  In order to fund the payment of this arrearage and other operating

expenses of the diner, Meads (not MLM Realty Trust) agreed to lend $81,200 to Ribeiro (not Jonquille).

On September 26, 2007, Meads loaned $81,200.10 to Ribeiro, who in turn executed a secured

promissory note in favor of Meads for that amount with interest at 15 percent (the "Original Note").

The Original Note called for 33 monthly payments of $2,800 and a final payment at month 34 of

$980.12, all commencing December 1, 2007.  There is no evidence that Meads actually advanced any new monies in this loan; it is clear however that, although the lender was Meads and not MLM Realty Trust, the Original Note constituted satisfaction of all past due rent then owed by Jonquille to MLM Realty Trust under the lease.[3]  It also constituted satisfaction of any obligation Jonquille or Ribeiro may have had to Meads or MLM Realty Trust for other advances they had made on Jonquille's behalf for obligations of Jonquille under the lease, such as for payment of real estate taxes.  In effect, the Original Note constituted the substitution of a new obligation of Ribeiro to Meads for the earlier obligations of Jonquille, and perhaps Ribeiro, to MLM Realty Trust under the lease.

The Original Note provided for three types of "security."  First, Ribeiro agreed to and did give Meads a mortgage on his home.  This mortgage was junior to an existing mortgage; it is unclear whether Meads' mortgage provided any real security.

Second, Ribeiro agreed to and did add Meads as a joint custodian of the checking account at the City of Boston Credit Union into which Ribeiro's monthly pension payments were deposited; Ribeiro's monthly pension payments were slightly more than $2,800.  This move was intended to and did enable Meads to write the checks by which payments would be made on the Original Note.[4]  Ribeiro agreed not to use the pension payments in this account for any other purpose.  Although he later breached this agreement on two occasions (and promptly cured his breaches), he intended to honor the agreement when he entered into it.

And third, Ribeiro agreed to further secure the Original Note by making the MLM Realty Trust, as assignee of Meads, the beneficiary on a $50,000 life insurance policy on Ribeiro's life.  The policy in question was issued by the Commonwealth of Massachusetts Group Insurance Commission (the "GIC").  It is not clear whether the policy was term or whole life.  When Ribeiro agreed to make MLM Realty

---

[3] It is unclear how Meads accomplished this as between himself and MLM Realty Trust—if he paid any attention to the distinction at all.
[4] To be clear, Ribeiro did not give Meads a security interest in the pension payments themselves, either anticipated or received.

Trust the beneficiary on this policy, the existing beneficiary was Ribeiro's wife.  On or around September 25, 2007, before he executed the Original Note, Ribeiro, with Meads and John Rocco ("Rocco"), went to the office of the GIC to complete and file the necessary change-of-beneficiary form.  Ribeiro testified and both Rocco and Meads corroborated that at the GIC, Ribeiro completed a Life Insurance Beneficiary Designation Form that named MLM Realty Trust as the beneficiary and handed it to a member of the commission's staff.  That beneficiary designation form, however, was missing from a packet of materials subpoenaed from the GIC and entered into evidence at trial.  The absence of the form is unexplained, and Meads called no keeper of the records from the GIC to testify about the matter.  Meads contends that, by some sleight of hand, Ribeiro must *not* have actually filed a change-of-beneficiary form that day.  However, the consistent testimony of Ribeiro, Meads, and Rocco is that Ribeiro did file the form: Ribeiro testified that he left the completed form with the GIC clerk, and Meads and Rocco, who went along *precisely to see this happen*, each corroborated that he believed Ribeiro had completed the form and left it with the clerk.  In view of this testimony and the further evidence that Ribeiro later filed another change-of-beneficiary form to reinstate his wife as the beneficiary (about which more below), something he would not have thought necessary had he not filed a form that removed her from the status, I find that Ribeiro did indeed file the form; the evidence preponderates in favor of that conclusion.

Meads relied on all three promises of security in agreeing to make the loan evidenced by the Original Note.  In particular, he relied on Ribeiro's promises (i) not to use the pension payments in his account at the City of Boston Credit Union for any purpose for as long as Meads needed them to fund payments on the Original Note and (ii) to continue the MLM Realty Trust in its status as beneficiary of the GIC life insurance policy status until the Original Note was paid in full.  Meads' reliance on these promises was justified.  Ribeiro does not contend otherwise.

Beginning in January 2008 and monthly thereafter, Meads wrote checks on Ribeiro's account at the City of Boston Credit Union to MLM Realty Trust to cover the monthly payments on the Original Note.  He made a total of twenty-eight or twenty-nine payments in that manner.  Two of the checks, the twentieth and twenty-fourth, were returned for insufficient funds because Ribeiro, without informing Meads, had in each instance withdrawn funds from his account to address other urgent obligations.  In each instance, however, Ribeiro promptly replaced the funds he had withdrawn, and Meads belatedly made the payment in question.

Meads alleges that Ribeiro's use of funds in this account to pay his mortgage is evidence that Ribeiro made his promises (i) to make the payments on the promissory note and (ii) not to use the pension funds in his Credit Union account without intent to honor them.  This conclusion is not supported by a preponderance of the evidence.  The evidence shows that Ribeiro succeeded in funding numerous payments on the Original Note, honored his promise not to use the Pension Payment with respect to all but two of the payments, first defaulted only in the twentieth month, defaulted only to address pressing needs and only after he had suffered serious and unforeseen health problems, promptly corrected even his two defaults, and eventually suffered his home to go to foreclosure rather than redirect his pension payments to saving it.  The evidence supports the conclusion that he made his promise regarding use off the pension payments with intent to honor it, indeed with a remarkable commitment to honoring it.  For the same reasons, I conclude that Ribeiro signed the Original Note, and entered into the loan agreement of which it was a part, with intent to honor its payment obligations.

**d.**    **Further Defaults and Amendment of the Original Note**

On January 22, 2008, just after payments had commenced on the Original Note, the MLM Realty Trust served Ribeiro, as proprietor of Jonquille, with a Notice to Vacate for Non-Payment of Rent and for Breach of Lease (the "Notice to Quit").  Meads testified at trial that he served the Notice to Quit on Ribeiro because he was not making rent payments.  The Notice to Quit itself, which was drafted by an

attorney for MLM Realty Trust, indicated that it was being served for failure to make the rent payment

that had come due on January 1, 2008, and for four other breaches of terms of the lease:  failure to

renew a license with the City of Revere; nonpayment of meals taxes to the Commonwealth;

nonpayment of real estate taxes to the City of Revere; and failure to insure the premises.

Notwithstanding the service of this notice, and for reasons not in evidence, MLM Realty Trust

did not then evict Jonquille, and Jonquille continued to operate on the premises.  Going forward,

Jonquille again fell into arrears on rent and other lease obligations, especially regarding payment of

taxes and utilities.  On July 26, 2009, Meads and Ribeiro addressed this arrearage with two measures.

First, they entered into an amendment to the lease under which monthly rent would be reduced

to $2,000 per month for the nine months from April through December, 2009, then revert in January

2010 to the rate that would otherwise be applicable under the lease, $2900 per month.  The

amendment also included an agreement that Jonquille "has decided to take Options 1, 2 and 3" under

the lease, each of which extended the lease for three years and increased the rent in the extension

period.  The amendment was signed by Ribeiro as "president" of Jonquille, Meads as trustee of MLM

Realty Trust, and Ribeiro individually as "guarantor."

Second, on July 26, 2009, Meads and Ribeiro executed an amendment to the Original Note (the

"Note Amendment," and the Original Note as amended, the "Amended Note") that (i) increased the

amount of the loan, and the principal amount of the promissory note, by $34,800, (ii) increased the

amount of the thirty-fourth payment from $980.12 to $2,800.00, and (iii) extended Ribeiro's repayment

obligation by thirteen monthly payments of $2,800 and a final payment at month 48 (due on November

1, 2011) of $1,020.  The Note Amendment and the further loan of which it was part served to cure

Jonquille's rent arrearage through July 2009 and to compensate Meads for amounts he had advanced on

Jonquille's behalf in satisfaction of other obligations of Jonquille under the lease.  The Note Amendment

added that except in these respects, the terms of the Original Note remained in effect.

Both parties understood that the Amended Note would be secured as was the Original Note. Meads relied on this in agreeing to the Note Amendment, and his reliance was justifiable, and Ribeiro was aware of Meads' reliance.  In two of three respects, the Amended Note did enjoy the same security as the Original:  Meads continued to have a mortgage on Ribeiro's house, and Meads continued to have the status of a custodian over the account into which Ribeiro's pension payments were deposited.

In the third respect, under which MLM Realty Trust was to have beneficiary status on Ribeiro's life insurance policy, MLM Realty Trust in fact did *not* continue to have the benefit of this status.  The evidence shows that on March 28, 2008, approximately six months after signing the Original Note, Ribeiro had filed another change of beneficiary form with the GIC to reinstate his wife as beneficiary, thereby effectively removing MLM Realty Trust from that status.  This was the state of the beneficiary designation when Meads and Ribeiro executed the Note Amendment, but Ribeiro had not notified Meads of this change.  Ribeiro later changed the beneficiary designation twice more:  on March 5, 2010, by designating his son as beneficiary; and again on January 4, 2011, by designating both his son and a friend as beneficiaries.  Ribeiro testified that he understood, when and after he replaced MLM Realty Trust as beneficiary, that he was violating the Original Note and later the Amended Note.

Only in the week before trial did Meads learn of the three beneficiary changes (those of March 28, 2008, March 5, 2010, and January 4, 2011) and of the apparent absence of the MLM Realty Trust designation from the records of the GIC.  He learned all of this by virtue of the GIC's response to a subpoena for production of documents that his attorney served on the GIC long after the close of discovery in this adversary proceeding and after the parties' filing of the Joint Pretrial Memorandum.[5] Each party was required by the Court's pretrial order to identify in the Joint Pretrial Memorandum each document it intended to introduce.  The Plaintiff identified no documents from the GIC in the Joint Pretrial Memorandum.  Nor did he identify, in the Joint Pretrial Memorandum or at any time before the

---

[5] The subpoena was issued August 2, 2013, for production at trial on August 7, 2013.

close of the trial, that he was amending his complaint to add a misrepresentation about beneficiary

status as a basis for a determination of nondischargeability under § 523(a)(2)(A). Ribeiro objected to

introduction of the documents from the GIC on the basis of surprise; and the court overruled that

objection, but also permitted Ribeiro to establish the fact of the surprise, which he has done. At no time

during the extended colloquy over this objection did Meads indicate that this evidence was being

introduced to support a cause of action neither pleaded with particularity in the complaint nor

mentioned in the Joint Pretrial Memorandum. At no time did Ribeiro explicitly or implicitly consent to

trial on allegations in the nature of fraud that were not pleaded. Indeed only when Meads filed his

proposed findings of fact and conclusions of law did the Court understand that Meads was seeking to

use an alleged misrepresentation about intent to make Meads a beneficiary as a basis for a

determination of nondischargeability under § 523(a)(2)(A), and not merely for its bearing on Ribeiro's

credibility and other alleged misrepresentations. I have no reason to believe that Ribeiro can have

understood the purpose for which this evidence was being offered before Meads' filing of his proposed

findings and conclusions.

Though I do not regard the issue has having been properly tried—that is, tried with due notice

to Ribeiro that this is a basis on which a determination of fraud, false representation, or false pretenses

was being sought—were I obligated to make a finding on the present record, I would find that Ribeiro

entered into the Loan Amendment under the false pretense that it was secured by a designation of

MLM Realty Trust as beneficiary, that Meads relied on the implicit representation as to this continuing

security, to his detriment, and that Ribeiro effected the false pretense with knowledge of its falsity and

knowledge of the deception thereby being practiced upon Meads. However, I would continue to find

that Ribeiro signed the Original Note with intent to honor the promise made at that time to designate

MLM Realty Trust as beneficiary and continue the Trust in that status. Especially in view of (i) the

eviction actions taken by Meads in January 2008, just after Ribeiro had given Meads the Original Note

and security to ensure its payment, (ii) Ribeiro's mounting health issues in 2007 and 2008, and (iii) the

mounting strains from the business on Ribeiro's marriage, Meads has not established by a

preponderance of the evidence that Ribeiro signed the Original Note without intent to continue MLM

Realty Trust in the status of beneficiary until the Note was satisfied.  The March 2008 change is more

likely attributable to a change of heart based on intervening events.  The false pretense would affect

only the additional debt created by the Note Amendment.

      The evidence of Ribeiro's various changes of beneficiary does not alter my conclusion, as to the

Original Note, that it was given with intent to honor the promise it included to repay the Original Note

as required.  Nor does it alter my conclusion that when he executed the Note Amendment, Ribeiro

intended to honor his promise to pay it, as evidenced by the continuation of payments for some nine

months after execution of the Note Amendment and even three months after commencement of

eviction proceedings in 2010.  He did not make these promises to pay without intent to honor them.

      **e.**      **Eviction Action, Agreement to Vacate, Action on Amended Note**

      On January 22, 2010, the MLM Realty Trust served Ribeiro, as proprietor of Jonquille, with a

Notice to Vacate for Non-Payment of Rent and for Breach of Lease (the "Second Notice to Quit").  The

Second Notice to Quit cited, as cause for eviction, a rent arrearage of $4,900—$2,000 for December

2009 and $2,900 for January 2010—and $1,929.25 in unpaid real estate taxes and water fees.  Later,

MLM Realty Trust commenced a summary process action against Jonquille and Ribeiro.  This action was

settled by an agreement under which Ribeiro and Jonquille agreed to and did vacate the premises

voluntarily in 2010 (the precise date is not in evidence) and the Trust waived all claims for rent and

other charges owing under the lease.

      On February 3, 2011, Meads sued Ribeiro in Massachusetts Superior Court for collection of the

balance due under the Amended Note, which balance the complaint quantified at $54,220.12.  The

complaint pleads counts for breach of contract and unjust enrichment but not for deceit, fraud,

misrepresentation of any kind, or violation of ch. 93A.  On February 15, 2011, Ribeiro commenced the

present bankruptcy case with a petition under chapter 13 of the Bankruptcy Code.  The Superior Court

action has not progressed since that date.

**JURISDICTION**

The matter before the court is a complaint under 11 U.S.C. § 523(a) to determine the

dischargeability of a debt.  It arises under the Bankruptcy Code and in a bankruptcy case and therefore

falls within the jurisdiction given the district court in 28 U.S.C. § 1334(b) and, by standing order of

reference, referred to the bankruptcy court pursuant to 28 U.S.C. § 157(a).  It is a core proceeding.  28

U.S.C. § 157(b)(2)(I) (core proceedings include determinations as to the dischargeability of particular

debts).  This court accordingly has authority to enter final judgment in the matter.  28 U.S.C. § 157(b)(1).

**DISCUSSION**

**a.      § 523(a)(2)(A)**

Section 523(a)(2)(A) of the Bankruptcy Code excepts from discharge any debt "for money,

property, services, or an extension, renewal, or refinancing of credit to the extent obtained by false

pretenses, a false representation, or actual fraud."  11 U.S.C. § 523(a)(2)(A).  A party seeking a

determination of non-dischargeability must establish by a preponderance of the evidence that a

particular debt falls within § 523(a)(2)(A) and therefore should be excepted from discharge.  *Grogan v.

Garner*, 498 U.S. 279, 291 (1991).  If the plaintiff fails to establish any one of the necessary elements of §

523(a)(2)(A), then the court should reject his claim.  *Palmacci v. Umpierrez*, 121 F.3d 781, 787-88 (1st

Cir. 1997).

Meads contends that that his judgment debt is excepted from discharge as one for an extension of credit obtained by false pretenses and false representations.[6]  Where an exception from discharge under § 523(a)(2)(A) is based on a false representation, the plaintiff must show that the debtor (1) made a false representation (2) with fraudulent intent ("scienter") and (3) intent to induce reliance on the representation, and that the misrepresentation (4) did induce reliance, (5) which was justifiable and (6) caused damage, pecuniary loss.  *Palmacci*, 121 F.3d at 786; *In re Burgess*, 955 F.2d 134, 139 (1st Cir. 1992) (as to elements other than reasonableness or justifiability of reliance).  Where the exception is based on false pretenses, the requirements are largely the same, except that the requirement of a false representation is replaced by a requirement of a false pretense, which is an implied misrepresentation or a false impression created by conduct of the debtor.  *Moen*, 238 B.R. at 791; *Sun Trust Bank v. Brandon (In re Brandon)*, 297 B.R. 308, 313 (Bankr. S.D. Ga. 2002) (as distinguished from false representation, which is an express misrepresentation, false pretense involves an implied misrepresentation or conduct intended to create and foster a false impression); *H.C. Prange Company v. Schnore (Matter of Schnore)*, 13 B.R. 249, 251-252 (Bankr. W.D. Wis. 1981) (same).  Silence—that is, the failure to disclose something that one was obligated to disclose—can form the basis of a finding of false pretense.  *Moen*, 238 B.R. at 791 and cases cited; *Drake Capital Securities v. Larkin (In re Larkin)*, 189 B.R. 234, 239 (Bankr. D. Mass. 1995).  The duty to disclose can be created by the false pretense itself.

> [W]hen the circumstances imply a particular set of facts, and one party knows the facts to be otherwise, that party may have a duty to correct what would otherwise be a false impression. This is the basis of the "false pretenses" provision of Section 523(a)(2)(A).

*Moen*, 238 B.R. at 791 (citations and internal quotations omitted).

---

[6] Although he also refers to "actual fraud," he does not invoke any test, or allege any conduct, that is different from false representation or false pretense.

The "concept of misrepresentation includes a false representation as to one's intention, such as a promise to act." *Palmacci*, 121 F.3d at 786.   Hence a false promise may constitute a false representation of intent:

> If, at the time he made his promise, the debtor did not intend to perform, then he has made a false representation (false as to his intent) and the debt that arose as a result thereof is not dischargeable (if the other elements of § 523(a)(2)(A) are met).   If he did so intend at the time he made his promise, but subsequently decided that he could not or would not so perform, then his initial representation was not false when made.

*Id*. at 787.

Scienter—meaning here intent to deceive, manipulate, or defraud—is established when the person making the representation "(a) knows or believes that the matter is not as he represents it to be; (b) does not have the confidence in the accuracy of his representation that he states or implies; or (c) knows that he does not have the basis for his representation that he states or implies." *Id*. (quoting Restatement (Second) of Torts § 526 (1977)).   In the absence of direct evidence, a court may infer intent to deceive from surrounding circumstances; however, "there must still be evidence of the circumstances which the plaintiff believes present a picture of the deceptive conduct." *In re Leger*, 34 B.R. 873, 878 (Bankr. D. Mass. 1983).   The court may choose to infer intent or not to draw that inference based on all of the evidence. *Palmacci*, 121 F.3d at 790.   I may consider subsequent conduct of the debtor as it may reflect the debtor's state of mind at the time a representation was made. *Williamson v. Busconi*, 87 F.3d 602, 603 (1st Cir. 1996).

The element of reliance has two parts.   The party upon whom the misrepresentation is practiced must actually have relied on the false pretense of false representation, and that reliance must have been justifiable (but need not have been reasonable).   Reliance is justifiable if the falsity of the representation would not have been readily apparent to the person to whom it was made. *Field v. Mans*, 516 U.S. 59, 70-72, 116. S.Ct. 437, 443-45 (1995).

An allegation of false representation or false pretense under § 523(a)(2)(A) is in the nature of fraud within the meaning of Fed. R. Civ. P. 9(b) (made applicable in adversary proceedings by Fed. R. Bankr. P. 7009).  Consequently, the party alleging a false representation or false pretense must state with particularity the circumstances constituting it.  Fed. R. Civ. P. 9(b).

### i.      Intent to Honor Promises of Payment

The complaint is no model of pleading false representation or false pretense with particularity. The Court is fortunately spared the task of determining the precise bases on which Meads seeks a determination of nondischargeability under § 523(a)(2)(A)—and of determining whether the complaint fairly put each in controversy—by the fact that Meads now seeks findings and rulings on only one basis that can arguably have been articulated in the complaint.  Specifically, he seeks a determination that, when he entered into the loan agreement and then the amendment to the loan agreement, Ribeiro made promises to repay the amounts advanced, but these promises were false statements of intent because, Meads contends, Ribeiro made them without intent to honor them.  It is undisputed that, when Ribeiro executed the Original Note and then the Note Amendment, he thereby made promises of repayment.  However, Ribeiro denies that he made these promises without intent to honor them, and I have found accordingly:  Ribeiro made his promises of repayment, as set forth in the Original Note and the Note Amendment, with intent to honor them.  His promises were not false.  Accordingly, the promises of repayment do not support a determination of nondischargeability.

### ii.     Other Allegations in the Complaint

Meads does not seek findings and rulings as to other allegations in the complaint, but neither has he expressly waived any of these.  None constitutes a basis for a determination of nondischargeability under § 523(a)(2)(A).

The complaint alleges that "[a]t the time of execution of this promissory note defendant again assured plaintiff that he (defendant) expected to have one or more investors involved with the restaurant in the near future."  The complaint does not allege that this representation was false.  The evidence does not establish that Ribeiro made this assurance to Meads—a representation as to his state of mind, that he had this particular expectation—much less that, if made, it was false (that Ribeiro did not have this expectation).  Nor is there evidence that Meads relied on any such assurance in entering into the original loan agreement.

The complaint alleges that at the time of execution of the Note Amendment, "Defendant again assured plaintiff that the restaurant was a viable business."  The complaint does not allege that this was false.  This representation, if it was made at all, was in the nature of an expectation or prediction of future business performance.  As such, it cannot be a false statement:  predictions are by nature speculative, not representations of a current state of affairs.  In any event, I find that Meads did not actually rely on any such representation, and any such reliance would not have been justifiable.  Meads well knew that the viability of the business was in quite some doubt—he knew that it could not pay its own bills and needed outside money, such as from Ribeiro's pension and the equity in his house.  To all appearances, the diner was *not* a viable business.

The complaint further alleges that at the time of execution of the Note Amendment, "Defendant again assured plaintiff that his taxes and other business expenses were being paid."  There is no evidence to find that Ribeiro made such a representation.   Again, I find that Meads did not actually rely on any such representation, and any such reliance would not have been justifiable.  The loan and loan amendment were necessary precisely because the taxes and other business expenses were *not* being paid, and Meads clearly knew this.

The complaint further alleges that at the time of execution of the Note Amendment, Ribeiro assured Meads "that he would obtain a mortgage on his residence if necessary to pay the note."  The

evidence shows that Ribeiro agreed to and did give Meads a mortgage to secure the Original Note and

Note Amendment.  It does not show that Ribeiro agreed or promised to obtain another mortgage, if

necessary, to pay the same obligations.  Nor could Meads have justifiably relied on any such

representation, where he knew that Ribeiro's home was already encumbered by at least two mortgages,

including one to him.

 The complaint further alleges that at the time of execution of the Note Amendment, Ribeiro

assured Meads "that he was searching for investors for the restaurant."  The complaint does not allege

that this representation was false, but Meads now at least implies that it was.  The evidence shows that

it was *not* false.  From 2007 onwards, Ribeiro sought investors and buyers for the restaurant.  To be

sure, Ribeiro was no investment banker, but he was doing this as best he could.  His efforts yielded at

least one offer, to purchase not just the diner business but also the real estate, but Meads did not want

to sell.  Also, Meads has not proven that, in making the amendment to the loan, he relied on Ribeiro's

promise of efforts to find an investor.

In the joint pretrial memorandum, Meads further alleges that Ribeiro "repeatedly promised

plaintiff that he would come current in his rental obligations and that he was concentrating on running

the business, when he was actually spending money on other things and neglecting the business,

including failing to pay municipal taxes."  Meads does not specify when Ribeiro made these alleged

promises and representation.  Meads has not established that Ribeiro made a promise to come current

on rent in conjunction with either the Original Note or the Note Amendment; these in fact brought him

current on the rent owing when they were executed—they replaced old debt with new—so such a

promise would have been odd and unnecessary.  Nor has Meads proven that, as inducement to enter

either the original loan or the loan amendment, Ribeiro made a representation to Meads that "he was

concentrating on running the business," much less that it was untrue at any time that Ribeiro was

concentrating on running the business.

### iii.    False Promise or Pretense Regarding Life Insurance

In his proposed findings and conclusions, Meads seeks a determination of nondischargeability on the basis of two further misrepresentations: that Ribeiro's promise of life insurance—the promise, given with the Original Note, to secure that note by designating the MLM Realty Trust as beneficiary of his life insurance policy—was a false promise; and that the pretense that the Note Amendment would be secured in the same way was a false pretense. Neither of these misrepresentations was asserted in the complaint as a basis for nondischargeability. Nor, though the Plaintiff went into the trial knowing he would be relying on these, did he at any time move to amend the complaint or otherwise put Ribeiro or the Court on notice that he would be relying on these new facts as grounds for nondischargeability.

This amounts to trial by ambush on counts as to which Ribeiro was entitled to notice in the form of pleading with particularity. Ribeiro went into the trial, even concluded the trial, without knowing that these new alleged misrepresentations would be matters on the basis of which Meads would be seeking a determination of nondischargeability. I cannot know what evidence Ribeiro might have adduced, or how he might otherwise have answered these new grounds, had he been afforded due notice. Without this notice, the trial that was held cannot be deemed a trial of counts based on these new alleged misrepresentations. Accordingly, no finding or rulings may be made on their merits, and the Court must deny relief on them.

### iv.    Conclusion as to 523(a)(2)(A)

For the above reasons, I conclude that Meads has not established cause to except from discharge any part of Ribeiro's liability to him, including (without limitation) under the Original or Amended Notes or under separate theories of unjust enrichment, fraud or deceit, or violation of ch. 93A. This renders moot Meads' separate count under ch. 93A.

**b.**    **Counterclaim**

Ribeiro asserts a counterclaim against Meads for unfair and deceptive practices under Mass.

Gen. Laws ch. 93A.  This claim arose before Ribeiro filed his bankruptcy petition.  Therefore, it belongs to

his bankruptcy estate.  11 U.S.C. § 541(a)(1) (bankruptcy estate includes all interests of the debtor in

property as of the commencement of the case).  The chapter 7 trustee has not abandoned it.  The

prerogative of bringing this count belongs at present to the chapter 7 trustee, not Ribeiro, and Ribeiro

lacks standing to prosecute it.  Accordingly, the Court will dismiss the counterclaim without prejudice to

its prosecution by the chapter 7 trustee or, after abandonment, by Ribeiro.  I express no opinion on its

merits.

**c.**    **Conclusion**

A separate judgment will enter dismissing with prejudice the complaint for determination of

nondischargeability and the count for damages under ch. 93A and dismissing without prejudice the

counterclaim for violation of ch. 93A.

Date:  June 19, 2014                        _____
                                           Frank J. Bailey
                                           United States Bankruptcy Judge